# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————————

THE RELIGIOUS SISTERS OF MERCY, et al.,

Plaintiffs-Appellees,

v.

XAVIER BECERRA, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of North Dakota

———————————

## PETITION FOR REHEARING *EN BANC*

———————————

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*
CHARLES W. SCARBOROUGH
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 353-9018*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 35 STATEMENT........................................................1

STATEMENT ...................................................................................................3

REASONS FOR GRANTING THE PETITION...........................................................6

I.    The Panel Erred in Permitting Plaintiffs to Use RFRA to Preemptively
Attack a Category of Hypothetical Future Government Actions
Without Meeting the Requirements of RFRA or Article III ................................7

II.    The Panel's Opinion Conflicts with this Court's Opinion
in School of the Ozarks ...............................................................................13

CONCLUSION .............................................................................................17

CERTIFICATIONS OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Burwell v. Hobby Lobby,*
573 U.S. 682 (2014) ............................................................................................7

*Clapper v. Amnesty Int'l,*
568 U.S. 398 (2013) ................................................................................... 10, 14

*Franciscan All., Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) .......................................................................5, 6, 9

*Franciscan All., Inc. v. Burwell,*
227 F. Supp. 3d 660 (N.D. Tex. 2016) .............................................................3

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006) .............................................................................2, 7, 8, 12

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................................................15

*School of the Ozarks, Inc. v. Biden,*
41 F.4th 992 (8th Cir. 2022), *reh'g en banc denied,*
2022 WL 4589688 (8th Cir. Sept. 30, 2022) ....................................2, 7, 13, 14

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................................... 8, 10

*Trump v. New York,*
141 S. Ct. 530 (2020) .......................................................................................9

*Walker v. Azar,*
480 F. Supp. 3d 417 (E.D.N.Y. 2020) .............................................................4

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.,*
485 F. Supp. 3d 1 (D.D.C. 2020) ............................................................. 4, 15

Appellate Case: 21-1890    Page: 3    Date Filed: 01/23/2023 Entry ID: 5238233

**Statutes:**

Civil Rights Act of 1964:
    42 U.S.C. § 2000e *et seq.*.................................................................1
    42 U.S.C. § 2000e-2(a).................................................................3

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119 (2010).........................................1
    42 U.S.C. § 18116(a).................................................................3

Religious Freedom Restoration Act of 1993,
    Pub. L. No. 103-141, 107 Stat. 1488 (42 U.S.C. § 2000bb *et seq.*)...................1
    42 U.S.C. § 2000bb(a)(3).................................................................16

20 U.S.C. § 1681(a).................................................................3

**Other Authorities:**

81 Fed. Reg. 31,376 (May 18, 2016) .................................................................3

85 Fed. Reg. 37,160 (June 19, 2020) .................................................................3-4, 4

86 Fed. Reg. 27,984 (May 25, 2021) .................................................................16

87 Fed. Reg. 47,824 (Aug. 4, 2022) .................................................................16

Appellate Case: 21-1890     Page: 4     Date Filed: 01/23/2023 Entry ID: 5238233

## INTRODUCTION AND RULE 35 STATEMENT

This case concerns challenges under the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488 (codified at 42 U.S.C. § 2000bb *et seq.*) (RFRA), to hypothetical future enforcement actions of the U.S. Department of Health and Human Services (HHS) and the U.S. Equal Employment Opportunity Commission (EEOC). Religious-entity plaintiffs brought suit seeking to prevent HHS from enforcing the prohibition of sex discrimination in Section 1557 of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA), and EEOC from enforcing the prohibition of sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), in a manner that would require plaintiffs to perform or provide insurance coverage for gender-transition services.

Neither HHS nor EEOC has determined whether entities with religious objections to providing or covering gender-transition services must do so to comply with Section 1557 or Title VII, much less threatened or initiated any enforcement actions against such entities. Nevertheless, a panel of this Court concluded that plaintiffs had standing to challenge both agencies' hypothetical future enforcement of these statutes, that plaintiffs' claims were ripe for review, and that plaintiffs had demonstrated irreparable injury sufficient to obtain a permanent, pre-enforcement injunction against both HHS and EEOC.

The panel's unprecedented opinion transforms RFRA from a shield against government action that actually infringes on religious exercise into a sword used to preemptively attack hypothetical, future government actions that might (or might not) impermissibly infringe religious liberties. The pre-enforcement RFRA challenges the panel endorsed here would allow religious-entity plaintiffs to obtain broad pre-enforcement injunctions in virtually any area in which the government might regulate or exercise its enforcement discretion, even where the agencies have expressly acknowledged that such discretion is bounded by RFRA and have never threatened or initiated enforcement actions against objecting religious entities. The panel's opinion also contravenes bedrock Article III standing and ripeness requirements and RFRA's requirement of a highly individualized "to-the-person" analysis. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-431 (2006).

The panel's opinion also conflicts with this Court's recent decision in *School of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1001 (8th Cir. 2022), *reh'g en banc denied*, 2022 WL 4589688 (8th Cir. Sept. 30, 2022). In *School of the Ozarks*, this Court held that the religious-college plaintiff did not have standing to challenge a Department of Housing and Urban Development (HUD) memorandum explaining that the Fair Housing Act's (FHA) prohibition on sex discrimination prohibits sexual-orientation and gender-identity discrimination. This Court emphasized that "it is speculative that HUD will file a charge of discrimination against the College." *Id.* at 998. The threat of enforcement is similarly speculative in this case, as HHS and EEOC have neither

2

threatened nor initiated any relevant enforcement activity against any objecting religious entities.

Because the panel's opinion presents questions of exceptional importance and conflicts with circuit precedent, this Court should grant rehearing en banc.

## STATEMENT

**1.** Plaintiffs' challenge to HHS concerns Section 1557 of the ACA, which prohibits "any health program or activity" "receiving Federal financial assistance" from discriminating against an individual based on "ground[s] prohibited under" several other statutes. 42 U.S.C. § 18116(a). One of the specified statutes is Title IX of the Education Amendments of 1972, which prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). With respect to EEOC, plaintiffs' challenge concerns the private sector provision of Title VII of the Civil Rights Act of 1964, which prohibits certain forms of employment discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a).

In 2016, HHS issued a rule interpreting Section 1557's prohibition on sex discrimination to prohibit discrimination on the basis of (*inter alia*) gender identity and stating that the categorical exclusion of health-insurance coverage for gender-transition services is unlawful. *See* 81 Fed. Reg. 31,376, 31,429 (May 18, 2016) (2016 Rule). The 2016 Rule was preliminarily enjoined nationwide in relevant part, and then rescinded by HHS in 2020 and replaced by the 2020 Rule. *See Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 670 (N.D. Tex. 2016); 85 Fed. Reg. 37,160 (June 19,

3

2020) (2020 Rule). The 2020 Rule did not define sex discrimination and stated that the religious exemptions provided by Title IX, RFRA, and other statutes would apply under Section 1557. 85 Fed. Reg. at 37,178, 37,209. The 2020 Rule was enjoined nationwide by two district courts to the extent it incorporated the Title IX religious exemption and repealed the 2016 definition of sex discrimination as including sex-stereotyping discrimination. *See Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 26 (D.D.C. 2020); *Walker v. Azar*, 480 F. Supp. 3d 417, 427 (E.D.N.Y. 2020). Both district courts acknowledged that their orders did not affect the *Franciscan Alliance* district court's vacatur of the 2016 Rule insofar as it defined sex discrimination to include gender-identity discrimination.

**2.** Plaintiffs are religious entities that provide health care, an association of religious employers, and an association of religious healthcare professionals. Plaintiffs filed suit in 2016 challenging the 2016 Rule's interpretation of "sex" as including gender identity and EEOC's interpretation of Title VII as prohibiting gender-identity discrimination. In 2020, plaintiffs amended their complaints to challenge HHS's potential future enforcement of Section 1557 to require them to perform or provide coverage for gender-transition services through the 2016 Rule, the 2020 Rule, or some other mechanism. Plaintiffs also challenged EEOC's potential future enforcement of Title VII to require them to provide insurance coverage for gender-transition services.

**3.** The district court issued a declaratory judgment and permanent injunctions barring HHS and EEOC from enforcing their respective statutes to impose the

4

requirements that plaintiffs oppose, on the ground that such enforcement would violate RFRA. The court first rejected the government's arguments that plaintiffs lacked standing and that their claims were not ripe, concluding that plaintiffs had shown a credible threat of enforcement sufficient to confer standing to bring a pre-enforcement challenge against both HHS and EEOC and that plaintiffs' claims were ripe because they presented purely legal issues. A777-A797.[1] On the merits, the court concluded that requiring the provision or coverage of gender-transition services would constitute a substantial burden on plaintiffs' religious exercise in violation of RFRA. A798-A802. The court further held that plaintiffs would suffer irreparable harm absent pre-enforcement injunctions.

**4.** A panel of this Court largely affirmed.[2] The panel held that plaintiffs have standing to challenge HHS's possible future enforcement of Section 1557 because they face a credible threat of enforcement. The panel relied heavily on the Fifth Circuit's decision in *Franciscan Alliance v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022), which also involved a pre-enforcement challenge to HHS's interpretation of Section 1557 but focused on mootness. The panel agreed with the Fifth Circuit that HHS's 2020 Rule and recent statements about Section 1557 "'threaten [the plaintiffs] in the

---

[1] Citations to the government's Appendix are abbreviated A__. Citations to the Addendum are abbreviated Add.__

[2] The panel reversed the district court's conclusion that plaintiff Catholic Benefits Association has associational standing to sue on behalf of its unnamed members. Add.26-28.

Appellate Case: 21-1890    Page: 9    Date Filed: 01/23/2023 Entry ID: 5238233

same way that the challenged portions of the 2016 Rule did.'" Add.33 (quoting *Franciscan Alliance*, 47 F.4th at 376). The panel emphasized that "the government cannot identify a long history of nonenforcement against the plaintiffs and others like them." Add.34. In the panel's view, this fact distinguished plaintiffs' claims here from the claims in *School of the Ozarks*.

The panel similarly concluded that plaintiffs have standing to challenge EEOC's possible future enforcement of Title VII. The panel reasoned that plaintiffs face a credible threat of enforcement because, in its view, HHS and EEOC would coordinate to pursue Title VII enforcement against employers whose health plans do not cover gender transition. Add.37. The panel also concluded that EEOC "has pursued enforcement against nonhealthcare employers that categorically exclude coverage for gender transitions from their health plans." *Id.*

With respect to ripeness, the panel summarily concluded that because plaintiffs have standing, their claims are "necessarily" ripe. Add.38. Finally, the panel relied on *Franciscan Alliance* to conclude that "the loss of freedoms guaranteed by . . . RFRA . . . constitute[s] per se irreparable harm." Add.39 (quoting *Franciscan Alliance*, 47 F.4th at 380).

## REASONS FOR GRANTING THE PETITION

Rehearing en banc is warranted because the panel's decision presents several questions of exceptional importance. If allowed to stand, the panel's decision would invite premature litigation by religious-entity plaintiffs seeking pre-enforcement

6

injunctions that broadly constrain the government's enforcement discretion before the relevant agencies even have an opportunity to evaluate RFRA in considering whether to initiate specific enforcement actions or narrowly tailoring relief in any such action. The panel's opinion contravenes core Article III standing and ripeness principles and RFRA's requirement of a fact-specific "to-the-person" analysis. Additionally, the panel's opinion conflicts with this Court's recent decision in *School of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1001 (8th Cir. 2022), *reh'g en banc denied*, 2022 WL 4589688 (8th Cir. Sept. 30, 2022).

## I.  The Panel Erred in Permitting Plaintiffs to Use RFRA to Preemptively Attack a Category of Hypothetical Future Government Actions Without Meeting the Requirements of RFRA or Article III.

The panel's decision turns RFRA's individualized inquiry on its head by enjoining an entire category of hypothetical future enforcement actions. The Supreme Court has explained repeatedly that courts should apply RFRA in a "focused" way by inquiring whether the government has a compelling interest in applying a challenged law or policy to "the particular claimant whose sincere exercise of religion is being substantially burdened." *Burwell v. Hobby Lobby*, 573 U.S. 682, 726-727 (2014) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-431 (2006)). The panel here did the opposite, preemptively declaring that a broad category of hypothetical future government actions would violate the plaintiffs' rights under RFRA, even though it is impossible to assess in advance whether such

7

enforcement actions—which may or may not ever materialize, and could take many different forms if they do—would substantially burden these plaintiffs' religious exercise or would be the least restrictive means to further compelling government interests.

Allowing pre-enforcement RFRA challenges of this nature deprives the government of an opportunity to demonstrate a compelling interest and least restrictive means, as required by RFRA, because there is no specific government action to analyze. Under this blunderbuss approach, it is essentially impossible to adhere to the Supreme Court's instruction to "scrutinize[] the asserted harm of granting *specific* exemptions to particular religious claimants," *O Centro*, 546 U.S. at 431 (emphasis added), because the government has not decided to enforce Section 1557 or Title VII against these plaintiffs at all, let alone in any particular manner. In affirming a broad injunction fundamentally rooted in speculation about enforcement actions the government *might* take at some point in the future, the panel thus ran afoul of both RFRA and well-established limits on judicial power under Article III.

Most importantly, the panel incorrectly concluded that plaintiffs have shown a "credible threat" of enforcement against them sufficient to support standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (explaining that a plaintiff "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"). HHS and EEOC

8

have not taken the position that Section 1557 or Title VII requires the provision or coverage of gender-transition services by entities with religious objections to providing such services. The fact that the agencies have not actually adopted the position that plaintiffs challenge should have been fatal to their claims. *See, e.g.*, *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam) (holding that both an absence of standing and a lack of ripeness impeded judicial resolution where the plaintiffs' claims were "riddled with contingencies and speculation").

The panel's conclusion that plaintiffs demonstrated standing as to HHS relies largely on the Fifth Circuit's decision in *Franciscan Alliance. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022). In particular, the panel pointed to *Franciscan Alliance's* conclusion that "HHS failed to carry its burden 'to demonstrate that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" Add.29-30 (quoting *Franciscan Alliance*, 47 F.4th at 376). However, the *Franciscan Alliance* decision principally addressed pre-enforcement standing concepts in the mootness context. Stressing that it was the government's burden to demonstrate mootness, the Fifth Circuit concluded that the government had not satisfied that high burden because the government's lingering "prosecutorial indecision" was enough to show that the case was not moot. *Franciscan Alliance*, 47 F.4th at 376. In contrast, this case involves no question of mootness; instead, *plaintiffs* have the burden of demonstrating standing.

The panel erred in relying on the Fifth Circuit's assessment of mootness in *Franciscan Alliance* to conclude that plaintiffs had demonstrated a credible threat of

9

enforcement by HHS sufficient to support standing in this case. Although the Fifth Circuit concluded that "prosecutorial indecision" was enough to show that the *government* had not carried its high burden to demonstrate mootness, the panel here departed from fundamental Article III principles in concluding that similar uncertainty in this case was sufficient for *plaintiffs* to carry their burden of demonstrating standing. *See* Add.33 (reasoning that government's assertion that "'it has not to date evaluated whether it will enforce Section 1557 against [the plaintiffs]' is actually a 'conce[ssion] that it may' do so").

To establish standing under Article III, a plaintiff must demonstrate that it has suffered a concrete injury, or that such an injury is "imminent" or "certainly impending." *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). In a pre-enforcement challenge like this one, a plaintiff can satisfy that standard by demonstrating a "credible threat of prosecution." *Susan B. Anthony List*, 573 U.S. at 159. But speculation that an agency "may" reject a religious entity's RFRA defenses and bring an enforcement action against it at some unspecified time in the future is woefully insufficient to establish a credible threat of prosecution that is "imminent" or "certainly impending." The panel thus erred in relying on *Franciscan Alliance* to conclude that plaintiffs had met their burden to demonstrate a credible threat of prosecution by HHS.

The panel also erred in concluding that plaintiffs have standing to challenge EEOC's hypothetical, future enforcement of Title VII. The panel mistakenly

10

concluded that HHS and EEOC would coordinate to pursue Title VII enforcement against religious employers whose health plans exclude gender transition. Add.37. But the panel relied on a misreading of the preamble of the now-rescinded 2016 Rule stating that charges of employment discrimination misfiled with HHS would be referred to EEOC. Nothing in that statement from HHS's 2016 Rule suggests that EEOC (a separate agency) would bring enforcement actions against religious entities who decline to cover gender-transition services. Rather, this language merely explains that a charge erroneously filed with HHS would be rerouted to EEOC.

The panel also concluded that EEOC "has pursued enforcement actions against nonhealthcare employers that categorically exclude coverage for gender transitions from their health plans." Add.37. However, EEOC has *never* brought an enforcement action against an objecting religious employer to challenge the employer's exclusion of gender-transition services in its health plan. Plaintiffs' examples—(1) a consent decree in a case in which an employee, not EEOC, asserted claims concerning the exclusion of gender-transition services from the employer's insurance plan; (2) EEOC's filing of an amicus brief in a case involving a private employer who did not raise any religious defenses; and (3) EEOC investigating a private employer who did not assert any religious defenses and inviting the employer to participate in voluntary conciliation—do not demonstrate otherwise.

The panel's cursory discussion of ripeness is also deeply flawed. The panel summarily concluded that because plaintiffs have standing, their claims are

11

"necessarily" ripe. Add.38. That not only conflates the distinct (albeit related) inquiries under the standing and ripeness doctrines but also ignores the highly individualized, fact-specific analysis required under RFRA. As the Supreme Court explained in *O Centro*, 546 U.S. at 430-431, RFRA requires specific analysis of the "application of the challenged law 'to the person.'" The Supreme Court further emphasized that "[c]ontext matters" and that the courts must analyze "specific exemptions." *Id.*

Here, plaintiffs challenge only hypothetical future enforcement action, and thus the lack of specific facts concerning what actions the agencies might take and what exemptions they might grant precludes a proper assessment of whether such hypothetical action substantially burdens plaintiffs' religious exercise, whether the government has a compelling interest in such action, and whether such action is the least restrictive means to further that interest. If, for example, HHS were to enforce Section 1557 to require an objecting religious entity to refer transgender patients to healthcare providers who are willing to provide such services, the RFRA analysis would necessarily be different than if HHS were to enforce Section 1557 to require an objecting religious entity to provide gender-transition surgery itself. In concluding that plaintiffs' broad challenge to any type of enforcement action that HHS or EEOC might conceivably take with respect to gender-transition services was ripe for review, the panel completely ignored the context-specific, "to-the-person" analysis required under RFRA.

12

Finally, for many of the same reasons, the panel erred in concluding that plaintiffs had demonstrated irreparable harm sufficient to justify permanent injunctions against HHS and EEOC. Plaintiffs have not shown that they will be irreparably harmed where the agencies have not actually adopted the positions that plaintiffs challenge and the agencies have neither threatened nor initiated enforcement activity of the sort plaintiffs purport to fear.

## II. The Panel's Opinion Conflicts with this Court's Opinion in *School of the Ozarks*.

The panel's opinion cannot be reconciled with this Court's recent decision in *School of the Ozarks*, 41 F.4th at 1001. That case involved a challenge to a HUD memorandum explaining that the FHA's prohibition on sex discrimination encompasses sexual-orientation and gender-identity discrimination. This Court held that the religious-college plaintiff did not have standing to challenge that memorandum, rejecting the college's argument that "there is an imminent threat" "that the government will enforce the [FHA] against the College." *Id.* at 998. This Court reasoned that the memorandum did not "require that HUD reach the specific enforcement decision that the College's current housing policies violate federal law." *Id.* In particular, the memorandum said "nothing of how [RFRA]" "may limit enforcement of the [FHA's] prohibition on sex discrimination as applied to the College." *Id.*

13

Additionally, this Court emphasized that "it is speculative that HUD will file a charge of discrimination against the College." *School of the Ozarks*, 41 F.4th at 998. As this Court explained, the college assumed that a discrimination complaint will be filed; that "HUD will charge the College with sex discrimination, even though HUD has never enforced the [FHA's] sex-discrimination prohibition against" a similarly situated college in the past; and that the College will be "subject to penalties." *Id.* at 1000. This Court concluded that "[t]his is the kind of 'highly attenuated chain of possibilities' that 'does not satisfy the requirement that threatened injury must be certainly impending.'" *Id.* (quoting *Clapper*, 568 U.S. at 410).

The panel opinion in this case conflicts with the holding and analysis in *School of the Ozarks*. Just as it was "speculative that HUD [would] file a charge of discrimination against the College," *School of the Ozarks*, 41 F.4th at 998, it is entirely speculative whether HHS or EEOC would ever bring an enforcement action against plaintiffs here. HHS and EEOC have never initiated or threatened enforcement action against plaintiffs or any other objecting religious entities; the agencies have made clear that they will comply with RFRA in exercising their enforcement discretion; and plaintiffs' alleged injury similarly relies on a "highly attenuated chain of possibilities." *Id.* at 1000 (quoting *Clapper*, 568 U.S. at 410).

The panel purported to distinguish *School of the Ozarks* on the ground that "the government cannot identify a long history of nonenforcement against the plaintiffs and others like them." Add.34. The panel noted that "plaintiffs have cited

14

enforcement activity in the years prior to the filing of the operative complaint suggesting that the rule is likely to be enforced against them." *Id.* But this conclusion is incorrect for two reasons. First, the panel misunderstood the type of enforcement that has previously occurred in the Section 1557 and Title VII contexts. Neither HHS nor EEOC has *ever* brought an enforcement action against an objecting religious entity to require the provision or coverage of gender-transition services. And in any event, the panel erroneously inverted the burden of proof by requiring *the government* to "identify a long history of nonenforcement," when it is *plaintiffs* who bear the burden of establishing an imminent and credible threat of enforcement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").

The panel also sought to distinguish *School of the Ozarks* on the ground that the college was protected by the religious exemption in Title IX, whereas HHS is enjoined from enforcing the 2020 Rule to the extent it incorporated Title IX's religious exemption. Add.34; *see Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 26 (D.D.C. 2020) (enjoining part of rescission of 2016 regulatory definition and enforcement of Title IX's religious exemption). However, this purported distinction is illusory, as HHS is still required to comply with the independent requirements of RFRA, which prevent the government from taking action that "substantially burden[s]

15

religious exercise without compelling justification." 42 U.S.C. § 2000bb(a)(3). Indeed, in its 2022 Notice of Proposed Rulemaking interpreting Section 1557, HHS emphasized that it is "fully committed to respecting conscience and religious freedom laws," including RFRA. *See* 87 Fed. Reg. 47,824, 47,841 (Aug. 4, 2022); *see also* 86 Fed. Reg. 27,984, 27,985 (May 25, 2021) (specifically emphasizing that HHS "will comply with [RFRA] and all other legal requirements" in enforcing Section 1557 to prohibit discrimination on the basis of gender identity).

\* \* \*

In sum, the panel's ruling rests on serious legal errors with serious practical consequences, and it conflicts with this Court's recent precedent. By affirming a broad, pre-enforcement injunction based entirely on speculation about enforcement action that HHS and EEOC might conceivably take at some point in the future, the panel has effectively rendered an advisory opinion on how RFRA constrains HHS's and EEOC's authority to carry out their statutory responsibilities, and it has done so without conducting any of the focused "to-the-person" analysis required under RFRA. Because the opinion violates bedrock Article III limitations on judicial power and effectively transforms RFRA from a shield to protect against government action that actually burdens religious exercise into a sword that can be used to constrain agencies' discretion to formulate policy and evaluate enforcement priorities in the first instance, rehearing en banc is warranted.

16

# CONCLUSION

For the foregoing reasons, the Court should grant rehearing en banc.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*
CHARLES W. SCARBOROUGH

 *s/ Ashley C. Honold*
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9018*
  *ashley.c.honold@usdoj.gov*

JANUARY 2023

Appellate Case: 21-1890     Page: 21     Date Filed: 01/23/2023 Entry ID: 5238233

## CERTIFICATIONS OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,871 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Ashley C. Honold*

Ashley C. Honold

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2023, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*s/ Ashley C. Honold*
Ashley C. Honold

2

**Addendum**

3

# ADDENDUM TABLE OF CONTENTS

Panel Opinion ................................................................................................ A1

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1890

_____

The Religious Sisters of Mercy; Sacred Heart Mercy Health Care Center, (Alma, MI); SMP Health System; University of Mary; Catholic Benefits Association; Diocese of Fargo; Catholic Charities of North Dakota; Catholic Medical Association

*Plaintiffs   Appellees*

State of North Dakota

*Plaintiff*

v.

Xavier Becerra, Secretary of the United States Department of Human Services; United States Department of Health and Human Services; Charlotte Burrows, Chair of the United States Equal Employment Opportunity Commission; United States Equal Employment Opportunity Commission

*Defendants   Appellants*
_____

Appeal from United States District Court
for the District of North Dakota - Eastern
_____

Submitted: December 15, 2021
Filed: December 9, 2022
_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.
_____

Add.1

SMITH, Chief Judge.

This case concerns an action by "a coalition of entities affiliated with the Catholic Church . . . challeng[ing] the implementation of Section 1557 of the Patient Protection and Affordable Care Act ('ACA'), a statute that prohibits certain forms of discrimination in healthcare." *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1122 (D.N.D. 2021), *judgment entered sub nom. Religious Sisters of Mercy v. Cochran*, No. 3:16-cv-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021). According to the plaintiffs, "the Department of Health and Human Services ('HHS') and, derivatively, the Equal Employment Opportunity Commission ('EEOC') interpret Section 1557 and related antidiscrimination laws in a way that compels them to perform and provide insurance coverage for gender transitions." *Id.* The district court held "that the [Religious Freedom Restoration Act of 1993 (RFRA)] entitles the . . . [p]laintiffs to permanent injunctive relief from the provision or coverage of gender-transition procedures." *Id.* On appeal, HHS and the EEOC (collectively, "the government") challenge the district court's grant of declaratory and permanent injunctive relief to the plaintiffs, arguing that the district court erred in determining "that plaintiffs had demonstrated standing, ripeness, and imminent irreparable injury sufficient to justify permanent injunctive relief." Appellants' Br. at ii. We affirm.

I. *Background*

A. *Statutes Prohibiting Sex Based Discrimination*

Section 1557 of the ACA provides, in relevant part, that a federally funded or administered health program or activity is prohibited from denying benefits to, or subjecting to discrimination, an individual "on [a] ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Section 1557 adopts the enforcement mechanisms available under the incorporated statutes, including Title IX. *Id.* Section 1557 vests the Secretary of HHS

-2-

with discretion to promulgate implementing regulations. *Id.* § 18116(c) ("The Secretary [of HHS] may promulgate regulations to implement this section.").

In turn, Title IX states that "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). "In short, the statute bars . . . sex-based discrimination." *Portz v. St. Cloud St. Univ.*, 16 F.4th 577, 580 (8th Cir. 2021) (internal quotation marks omitted). But Title IX exempts from its restrictions "an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Title IX "authoriz[es] federal administrative enforcement by terminating the federal funding of any noncomplying recipient, [20 U.S.C.] § 1682(1), or 'by any other means authorized by law,' § 1682(2)." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 467 n.5 (1999). The Supreme "Court has [also] recognized an implied private right of action." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009).

In addition to Title IX and Section 1557, Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an applicant or employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII "limit[s] . . . covered 'employer[s]' to those with 15 or more employees." *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1850 (2019) (third alteration in original) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 503–04 (2006) (quoting 42 U.S.C. § 2000e(b))). An employer who violates Title VII could face an administrative enforcement action or private suit for compensatory damages, punitive damages, injunctive relief, attorney's fees, and other relief. *See* 42 U.S.C. § 2000e-5(g); *id.* § 1981a(b). The EEOC "is empowered . . . to prevent any person from engaging in any unlawful employment practice" under Title VII. *Id.* § 2000e-5(a). "We have . . . held that 'the Supreme Court's interpretation of Title VII properly informs our examination of Title IX.'"

-3-

*Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021) (quoting *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011) (applying Title VII jurisprudence to a Title IX discrimination claim)).

## B. *2016 Rule*

In 2016, HHS promulgated a "final rule implement[ing] Section 1557 of the Affordable Care Act (ACA) (Section 1557)." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,376 (May 18, 2016) (hereinafter, "2016 Rule"). The 2016 Rule defined "[c]overed entity" as "[a]n entity that operates a health program or activity, any part of which receives Federal financial assistance." *Id.* at 31,466. It defined "[h]ealth program or activity" as "the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage." *Id.* at 31,467. For entities "principally engaged" in those endeavors, the regulation extended to "all of [their] operations." *Id.* at 31,438. In the 2016 Rule, HHS "concluded that almost all practicing physicians in the United States are reached by Section 1557 because they accept some form of Federal remuneration or reimbursement apart from Medicare Part B." *Id.* at 31,446. HHS identified 180 insurers that offered health plans through ACA or state-based marketplace as affected by the regulation. *Id.* at 31,448. It also estimated "about 133,343 [healthcare] facilities" were covered entities. *Id.* at 31,445.

Consistent with Title IX, the 2016 Rule prohibited discrimination "on the basis of . . . sex." *Id.* at 31,469. The 2016 Rule defined "[o]n the basis of sex" as "includ[ing] . . . sex stereotyping[] and gender identity." *Id.* at 31,467. HHS based the definition of "on the basis of sex" "upon existing regulation and previous Federal agencies' and courts' interpretations that discrimination on the basis of sex includes discrimination on the basis of gender identity and sex stereotyping." *Id.* at 31,388. It defined "[s]ex stereotypes" as "includ[ing] the expectation that individuals will consistently identify with only one gender and that they will act in conformity with

-4-

the gender-related expressions stereotypically associated with that gender." *Id.* at 31,468. It defined "[g]ender identity" as

> an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth. The way an individual expresses gender identity is frequently called "gender expression," and may or may not conform to social stereotypes associated with a particular gender. A transgender individual is an individual whose gender identity is different from the sex assigned to that person at birth.

*Id.* at 31,467.

> The 2016 Rule required a covered entity to

> treat individuals consistent with their gender identity, except that a covered entity may not deny or limit health services that are ordinarily or exclusively available to individuals of one sex, to a transgender individual based on the fact that the individual's sex assigned at birth, gender identity, or gender otherwise recorded is different from the one to which such health services are ordinarily or exclusively available.

*Id.* at 31,471. "For example, . . . . [a] provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." *Id.* at 31,455.

Under the 2016 Rule, a covered entity's "denial of a claim for coverage for transition-related care" based on "an explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful

Appellate Case: 21-11890    Page: 30    Date Filed: 12/23/2022    Entry ID: 5222323

on its face." *Id.* at 31,429; *see also id.* at 31,471–72. Additionally, HHS explained that

> in evaluating whether it is discriminatory to deny or limit a request for coverage for a particular service for an individual seeking the service as part of transition-related care, . . . [it] w[ould] start by inquiring whether and to what extent coverage is available when the same service is not related to gender transition. If, for example, an issuer or State Medicaid agency denies a claim for coverage for a hysterectomy that a patient's provider says is medically necessary to treat gender dysphoria, [HHS] will evaluate the extent of the covered entity's coverage policy for hysterectomies under other circumstances.

*Id.* at 31,429. In such circumstance, HHS would "carefully scrutinize whether the covered entity's explanation for the denial or limitation of coverage for transition-related care is legitimate and not a pretext for discrimination." *Id.*

While the 2016 Rule provided that the statutory exceptions applicable for discrimination based on race, color, national origin, age, and disability applied, *see id.* at 31,470, it omitted Title IX's religious exemption, *see id.* HHS expressly "decline[d] to adopt commenters' suggestion that [it] import Title IX's blanket religious exemption into Section 1557," noting that "Section 1557 itself contains no religious exemption" and that "Title IX and its exemption are limited in scope to educational institutions." *Id.* at 31,380 (footnote omitted). HHS found "significant differences between the educational and health care contexts that warrant different approaches." *Id.* Furthermore, it found that

> a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results. Thus, it is appropriate to adopt a more nuanced approach in the health care context, rather than the blanket religious exemption applied for educational institutions under Title IX.

-6-

*Id.*

Although HHS "decided against including a blanket religious exemption in the final rule," *id.* at 31,376, it excepted applications that "would violate applicable Federal statutory protections for religious freedom and conscience," *id.* at 31,466. According to HHS, "the proposed rule would not displace the protections afforded by . . . RFRA." *Id.* at 31,379 (footnotes omitted). HHS explained that "application of RFRA is the proper means to evaluate any religious concerns about the application of Section 1557 requirements." *Id.* at 31,380. HHS further noted that it would evaluate "individualized and fact specific" RFRA claims "on a case-by-case basis." *Id.* "To obtain an exception, in other words, a provider objecting on religious grounds needed to convince HHS that the regulation circumstantially violated the RFRA." *Azar*, 513 F. Supp. 3d at 1125 (citing R. Doc. 95, at ¶ 51).

"[S]everal commenters [to the 2016 Rule] recommended that [it] not apply to services of third party administrators providing administrative services to self-insured group health plans." 2016 Rule, 81 Fed. Reg. at 31,431. They maintained that Section 1557 does not apply to third party administrators because they "do not design plans, are not responsible for determining the benefits covered under the plan, and are required by [the Employment Retirement Income Security Act (ERISA)] to administer plans as they are written." *Id.* (footnote omitted). But HHS declined to "exclud[e] third party administrator services from the final rule." *Id.* at 31,432. Instead, it "adopt[ed] specific procedures to govern the processing of complaints against third party administrators." *Id.* HHS "recognize[d] that third party administrators are generally not responsible for the benefit design of the self-insured plans they administer." *Id.* It also recognized that "ERISA . . . requires plans to be administered consistent with their terms. Thus, if a plan has a discriminatory benefit designed under Section 1557, a third party administrator could be held responsible for plan features over which it has no control." *Id.* HHS responded to this problem by

-7-

Appellate Case: 21-11890 Page: 32 Date Filed: 12/23/2023 Entry ID: 5223123

"adjusting the way in which it . . . process[es] claims that involve alleged discrimination in self-insured group health plans administered by third party administrators that are covered entities." *Id.* HHS would "refer matters to other [f]ederal agencies with jurisdiction over [an] entity" not under HHS's jurisdiction. *Id.*

> Where, for example, [HHS] lacks jurisdiction over an employer responsible for benefit design, [HHS] typically will refer or transfer the matter to the EEOC and allow that agency to address the matter. The EEOC has informed [HHS] that, provided the filing meets the requirements for an EEOC charge, the date a complaint was filed with [HHS] will be deemed the date it was filed with the EEOC . . . .

*Id.*

At the time of the 2016 Rule's publication, the "EEOC [had] interpret[ed] and enforce[d] Title VII's prohibition of sex discrimination as forbidding any employment discrimination based on *gender identity or sexual orientation*." R. Doc. 97-7, at 1. "Some examples of LGBT-related claims that EEOC view[ed] as unlawful sex discrimination include[d] . . . [f]ailing to hire an applicant because she is a transgender woman. . . . [and] [d]iscriminating against or harassing an employee because of his or her . . . gender identity, . . . for example, on the basis of transgender status." *Id.* at 2. Indeed, the EEOC had previously found "intentional discrimination against a transgender individual because that person's gender identity is, by definition, discrimination based on sex and therefore violates Title VII." *Id.* at 3 (citing *Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995 (April 20, 2012)). The EEOC continues to follow this interpretation of Title VII . *See* EEOC, *Fact Sheet: Recent EEOC Litigation Regarding Title VII & LGBT Related Discrimination*, https://www.eeoc.gov/fact-sheet-recent-eeoc-litigation-regarding-title-vii-lgbt-related-discrimination (last updated July 8, 2016).

-8-

Shortly after the 2016 Rule took partial effect, a group of states and private religious healthcare providers filed suit in the Northern District of Texas. *See Franciscan All., Inc. v. Burwell (Franciscan Alliance I)*, 227 F. Supp. 3d 660 (N.D. Tex. 2016). That district court entered "a nationwide [preliminary] injunction," *id.* at 695, prohibiting HHS from "enforcing the [2016] Rule's prohibition against discrimination on the basis of gender identity," *id.* at 696. First, the court determined that the 2016 Rule violated the Administrative Procedures Act (APA) by impermissibly expanding the scope of sex discrimination under Title IX to include gender identity. *Id.* at 689. Second, the court concluded that the 2016 "Rule's failure to include Title IX's religious exemptions renders the Rule contrary to law." *Id.* at 691. Third, the court found that the plaintiffs "demonstrated a substantial likelihood of success on their claim that the [2016] Rule violates RFRA." *Id.* at 693.

Contemporaneously, the two cases giving rise to this appeal were filed. Relevant to the present appeal, the Religious Sisters of Mercy,[1] Sacred Heart Mercy Health Care Center,[2] SMP Health System,[3] and the University of Mary[4] (collectively,

---

[1]Religious Sisters of Mercy is "a Catholic order of religious sisters devoted to works of mercy, including offering healthcare to the underserved." R. Doc. 96-2, at ¶ 2. It is a nonprofit corporation located in Alma, Michigan, and "officially approved by the Vatican." *Id.* ¶ 3. The sisters "have chosen to follow Jesus Christ by taking a lifetime vow to serve the poor and sick by offering care for the whole person, and working to heal those who are suffering from physical, psychological, intellectual, and spiritual woundedness." *Id.* at ¶ 4. As part of that mission, some sisters serve as licensed healthcare professionals.

[2]The Religious Sisters of Mercy own and operate Sacred Heart Mercy Health Care Center (Sacred Heart), a nonprofit clinic located in Alma, Michigan. "Some of the Religious Sisters of Mercy serve as licensed doctors, nurses, or other healthcare professionals who perform medical services in this clinic." *Id.* at ¶ 6. Sacred Heart serves "poor, disabled, and elderly Medicare and Medicaid patients." *Id.* at ¶ 8. "The Religious Sisters of Mercy . . . run the clinic in accordance with the Ethical and

Appellate Case: 21-1890   Page: 34   Date Filed: 12/23/2022   Entry ID: 5223423

"RSM plaintiffs")[5] filed suit, alleging that HHS had violated, among other things, the APA, the First Amendment, and the RFRA. Additionally, the Catholic Benefits Association (CBA);[6] Diocese of Fargo (Diocese);[7] Catholic Charities North Dakota

---

Religious Directives of the United States Conference of Catholic Bishops." *Id.* ¶ 6.

[3]"SMP Health System is operated according to the religious beliefs of its sponsor, the Sisters of Mary of the Presentation." R. Doc 96-3, ¶ 4. It is headquartered in Valley City, North Dakota, and operates healthcare facilities in North Dakota and Illinois. "SMP Health System has a special emphasis on providing services to the poor and elderly, including many Medicare and Medicaid patients." *Id.* at ¶ 4. "The Sisters of Mary of the Presentation operate SMP Health System in a manner that abides by The Ethical and Religious Directives for Catholic Healthcare Services, as issued by the United States Conference of Catholic Bishops and interpreted by the local Bishop." *Id.* at ¶ 5 (emphasis omitted).

[4]The University of Mary (University) is a Roman Catholic university founded by the Benedictine Sisters and located in Bismarck, North Dakota. "The University welcomes students of all faiths and backgrounds," but it " upholds Catholic teaching in its programs and services." R. Doc. 96-4, at ¶ 6. The University offers a nursing program and operates a student health clinic that both receive funding from HHS.

[5]Each of the RSM plaintiffs believe "that every man and woman is created in the image and likeness of God, and that they reflect God's image in unique—and uniquely dignified—ways." R. Docs. 96-2, at ¶ 9; 96-3, at ¶ 6; 96-4, at ¶ 9. Each of them also serves every individual who needs and qualifies for care, including transgender persons. But the RSM plaintiffs believe that performing gender-transition procedures would violate their medical judgment by potentially causing harm to patients. Additionally, they believe that they would violate their religious beliefs regarding human sexuality and procreation if they performed, among other things, gender-transition services. They also object for religious reasons to providing insurance coverage for their eligible employees for gender transitions.

[6]The CBA is a nonprofit corporation and Catholic ministry. One of its purposes is "[t]o support Catholic employers . . . that, as part of their religious witness and

-10-

Appellate Case: 21-1890    Page: 36    Date Filed: 02/09/2023 Entry ID: 5238433

(Catholic Charities);[8] and Catholic Medical Association (CMA)[9] (collectively, "CBA

exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values." R. Doc. 97-1, at 2. The CBA's membership includes over 1,030 employers and 5,100 Catholic parishes within more than 60 dioceses and archdioceses. Collectively, its membership covers more than 90,000 employees and their families. Only Catholic employers that commit to providing benefits and services consistent with Catholic values may become CBA members. Several CBA members receive funding from Medicare, Medicaid, or other HHS-administered programs for healthcare or health-related services. Additionally, some employer members like Catholic dioceses and archdioceses offer employee health benefits in conjunction with health insurers and third-party administrators that receive federal financial assistance.

[7]The Diocese's purpose is to carry out the spiritual, educational, and social service mission of the Catholic Church in eastern North Dakota. It employs more than 15 individuals and operates a self-insured health plan for its employees. Additionally, several Catholic parishes and affiliated ministries within the Diocese participate in the health plan. Blue Cross Blue Shield of North Dakota (BCBSND) is the third-party administrator that administers the Diocese's health plan. BCBSND receives federal financial assistance through an ACA exchange. The Diocese has an indemnification agreement with BCBSND for decisions related to health plan design, such as the exclusion of gender-transition coverage.

[8]Catholic Charities uses social service programs to serve the poor, elderly, and disabled. Its social service programs include disaster relief, individual and family counseling, adoption services, pregnancy counseling, and guardianship services for adults with special needs. It employs more than 15 individuals. Catholic Charities contracts with an insurer that receives federal financial assistance from HHS to provide benefits to its employees.

[9]CMA is a national, physician-led community of healthcare professionals. Its purpose is to uphold Catholic-faith principles in the science and practice of medicine. CMA members promise to adhere to Catholic moral principles, particularly those related to bio-medical ethics. Consistent with their faith, CMA members do not provide gender-transition services. Some CMA members do perform procedures like

-11-

plaintiffs") filed suit, seeking declaratory and injunctive relief pursuant to the RFRA against HHS's and the EEOC's interpretation and enforcement of the relevant statutes to the extent they required the CBA plaintiffs to "provide, perform, pay for, cover, or facilitate access to health services for gender transition." R. Doc. 97, at 81. The district court stayed enforcement of the 2016 Rule's prohibition against gender-based identity discrimination as applied to the RSM plaintiffs and CBA plaintiffs. The court also acknowledged *Franciscan Alliance I*'s nationwide preliminary injunction.

Following these decisions, the present case and the *Franciscan Alliance* case were stayed to enable HHS to consider further rulemaking.

Over a year passed while a draft of a new proposed rule circulated through the executive branch. Then, in December 2018, the *Franciscan Alliance* litigation restarted. The plaintiffs in that case moved for partial summary judgment and permanent injunctive relief as to only the APA and RFRA claims. The district court granted the plaintiffs' summary-judgment motion. *Franciscan All., Inc. v. Azar (Franciscan Alliance II)*, 414 F. Supp. 3d 928, 944 (N.D. Tex. 2019). First, it found "no reason to depart from its analysis on the APA claim." *Id.* at 942. Second, it held "that the [2016] Rule, which expressly prohibits religious exemptions, substantially burdens Private Plaintiffs' religious exercise in violation of RFRA." *Id.* at 944. "But it declined to issue an injunction because it found there was no indication that, if the rule was vacated, HHS would bring an enforcement action against Franciscan Alliance." *Franciscan All., Inc. v. Becerra (Franciscan Alliance V)*, 47 F.4th 368, 372 (5th Cir. 2022). Instead, it vacated the gender-identity prohibition, among other things, and remanded to HHS for further consideration. *Franciscan Alliance II*, 414

---

hysterectomies and mastectomies that other physicians perform as part of gender transitions. Some CMA members also offer health benefits for employees that exclude coverage for gender transitions.

-12-

F. Supp. 3d at 947. "Soon thereafter, the [c]ourt modified the Final Judgment to clarify that it vacated the 2016 Rule insofar as it defined 'on the basis of sex' to include gender identity . . . ." *Franciscan All., Inc. v. Becerra (Franciscan Alliance IV)*, 553 F. Supp. 3d 361, 366 (N.D. Tex. 2021), *amended*, No. 7:16-CV-00108-O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021). "Franciscan Alliance timely appealed the denial of permanent injunctive relief." *Franciscan Alliance V*, 47 F.4th at 372.

## C. *2020 Rule and* Bostock *Decision*

"[T]he landscape [then] drastically shifted." *Franciscan Alliance IV*, 553 F. Supp. 3d at 366. In June 2020, HHS repealed the 2016 Rule and finalized a new Section 1557 rule. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (hereinafter, "2020 Rule"). The 2020 Rule adopted Title IX's religious exemption and "repeal[ed] the 2016 Rule's definition of 'on the basis of sex,' but decline[d] to replace it with a new regulatory definition. Instead, the [2020] [R]ule revert[ed] to, and relie[d] upon, the plain meaning of the term in [Title IX]." *Id.* at 37,178 (citation omitted).

At the time that HHS issued the 2020 Rule, *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), was pending. The question presented in *Bostock* was whether an employer violates Title VII's proscription of discrimination "because of . . . sex" by "fir[ing] an individual for being homosexual or transgender." *Id.* at 1737. HHS acknowledged that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the basis of sex' under Title IX." 2020 Rule, 85 Fed. Reg. at 37,168. HHS further acknowledged that "to the extent that a Supreme Court decision is applicable in interpreting the meaning of a statutory term, the elimination of a regulatory definition of such term would not preclude application of the Court's construction." *Id.*

-13-

Appellate Case: 21-1890     Page: 38     Date Filed: 02/09/2023     Entry ID: 5238433

Like the 2016 Rule, the 2020 Rule did "not craft a religious exemption to Section 1557." *Id.* at 37,207. HHS reasoned that "Congress has already created various religious and conscience protections in healthcare by enacting several statutes, including RFRA, healthcare conscience statutes, and the religious organization exception in Title IX." *Id.* The 2020 Rule provided that Section 1557 "will be implemented consistent with those statutes." *Id.*

Shortly after HHS finalized the 2020 Rule, the Supreme Court decided *Bostock*. The Court held that "[w]hen an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex" under Title VII. 140 S. Ct. at 1744. In other words, the Court interpreted Title VII's prohibition on "sex discrimination" to include gender identity and sexual orientation. Although the Court "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female," *id.* at 1739, it determined that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," *id.* at 1741. But the Court cautioned that it was not "prejudg[ing]" whether its "decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Id.* at 1753. The Court also expressed "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution." *Id.* at 1754. "But," the Court noted, "worries about how Title VII may intersect with religious liberties are nothing new." *Id.* In fact, Congress went "a step further . . . in . . . RFRA" by "prohibit[ing] the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest." *Id.* "Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws," the Court explained, "it might supersede Title VII's commands in appropriate cases." *Id.* Thus, "other employers in other cases may raise free exercise arguments that merit careful consideration." *Id.*

-14-

"*Bostock* triggered multiple lawsuits challenging the 2020 Rule. Most relevant here, two courts entered nationwide injunctions preventing much of the 2020 Rule from going into effect, effectively reinstating portions of the 2016 Rule (the [*Walker*] and *Whitman Walker* opinions)." *Franciscan Alliance V*, 47 F.4th at 372 (citing *Whitman Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020); *Walker v. Azar*, 480 F. Supp. 3d 417, 420 (E.D.N.Y. 2020)). While the *Walker* and *Whitman Walker* courts recognized that they lacked any power to undo the *Franciscan Alliance* district court's vacatur, "in effect they did just that." *Id.* Neither court "directly resurrect[ed] the 2016 Rule's prohibition on 'gender identity' discrimination"; however, "they did reanimate the rule's 'sex-stereotyping' prohibition." *Id.* (citing *Whitman Walker*, 485 F. Supp. 3d at 64; *Walker*, 480 F. Supp. 3d at 430). "Both courts further reasoned that, in light of *Bostock*, sex-stereotyping discrimination encompasses gender identity discrimination." *Id.* (citing *Whitman Walker*, 485 F. Supp. 3d at 39–42; *Walker*, 480 F. Supp. 3d at 429–30). Additionally, the *Whitman Walker* court "enjoined the 2020 Rule's incorporation of Title IX's religious exemption, even though the [*Franciscan Alliance*] district court . . . held that the 2016 Rule was unlawful for not providing such an exemption." *Id.* (footnote omitted) (citing *Whitman Walker*, 485 F. Supp. 3d at 64).

### D. *Present Lawsuit*

On November 6, 2020, the RSM plaintiffs and CBA plaintiffs (collectively, "plaintiffs") moved to lift the stay in the present case. The district court granted the motion.

On November 23, 2020, the plaintiffs timely filed amended complaints and contemporaneously moved for partial summary judgment and permanent injunctive relief. The RSM plaintiffs challenged HHS's interpretation of Section 1557 to "require[] [them] to provide and insure gender-transition procedures . . . or else face

-15-

liability for 'sex' discrimination." R. Doc. 96, at 1–2. They moved for partial summary judgment, arguing that HHS's interpretation of Section 1557 violates the RFRA and the APA. The CBA plaintiffs relied exclusively on the RFRA. They requested relief from the same interpretation of Section 1557, as well as from parallel interpretations of Title VII, Title IX, or any other federal laws. In the alternative, all the plaintiffs moved for a preliminary injunction.

The government responded in opposition to the motions and moved to dismiss both cases in their entirety for lack of jurisdiction. It argued that the plaintiffs did not have standing because they lacked a cognizable injury; the claims were moot because "HHS has repealed the challenged portions of the 2016 Rule and incorporate[d] religious . . . exemptions that apply to [the] [p]laintiffs"; and the claims were "unripe to the degree any alleged injury is based on any possible future regulatory or enforcement action." R. Doc. 113, at 15.

1. *Jurisdiction*
a. *Standing*
i. *Section 1557*

The district court first considered whether the plaintiffs have standing to challenge HHS's current interpretation of Section 1557. It determined that the RSM plaintiffs "qualify as objects of Section 1557 and its implementing regulations" because they "operate health programs receiving federal financial assistance from HHS." *Azar*, 513 F. Supp. 3d at 1136.

It then concluded that the CBA has associational standing to challenge HHS's interpretation of Section 1557. *See id.* (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011). According to the court, "[t]he CBA's purpose of supporting Catholic employers that wish to provide employee benefits consistent with their religious beliefs is . . . germane to a lawsuit that challenges

-16-

regulations affecting members' health plans." *Id.* at 1137. The court determined that the individual members' participation is not required because the CBA, as an organization plaintiff, "s[ought] only declaratory and prospective relief." *Id.* (quoting *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005)). "As for the ability of individual members to sue," the court concluded that "the CBA's verified second amended complaint confirms that its membership includes Catholic hospitals and other healthcare entities 'that receive Medicaid and Medicare payments and participate in HHS-funded programs.'" *Id.* (quoting R. Doc. 97, at ¶¶ 55–56).

Because "at least some CBA members [are] on equal footing with the [RSM] [p]laintiffs," the question was "whether those Plaintiffs—and, by implication, the similarly situated CBA members—possess standing." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)). The district court determined that an injury-in-fact existed for three reasons. "First," the court concluded, "the [p]laintiffs' conduct implicates constitutional interests"; specifically, the "exercise of their religious beliefs protected by the First Amendment." *Id.* at 1138.

"Second," the court reasoned, "Section 1557 'arguably proscribe[s]' the [p]laintiffs' refusal to perform or cover gender-transition procedures." *Id.* (first alteration in original) (quoting *Susan B. Anthony List*, 573 U.S. at 162). As support, the district court noted that "two district courts entered partially overlapping preliminary injunctions that collectively reinstate the prior definition of 'on the basis of sex' to include 'gender identity' and 'sex stereotyping.'" *Id.* (citing *Walker*, 480 F. Supp. 3d at 430; *Whitman Walker*, 485 F. Supp. 3d at 65–65). The court also noted that "[t]he *Whitman Walker* court . . . enjoined incorporation of the Title IX religious exemption." *Id.* (citing *Whitman Walker*, 485 F. Supp. 3d at 64–65). Furthermore, the court concluded, "the [p]laintiffs face potential consequences from the 2020 Rule even without the injunctions. . . . because HHS declined to promulgate a new regulatory definition for 'sex,' instead leaving the door open to 'application of the

-17-

[*Bostock*] Court's construction.'" *Id.* at 1138 (third alteration in original) (quoting 2020 Rule, 85 Fed. Reg. at 37,168). Recent decisions following *Bostock* and "HHS's own statements" indicated that "the [p]laintiffs' refusal to perform or cover gender-transition procedures arguably falls within the ambit of Section 1557." *Id.* at 1139.

"Third," the court concluded that "a credible threat of enforcement endures" because "Section 1557 is amenable to an interpretation that would expose the Plaintiffs to liability for declining to provide or insure gender-transition services." *Id.* The court found "no evidence . . . that authorities have actually refused to enforce the statute." *Id.* (internal quotation marks omitted). Instead, "HHS has undertaken two rulemakings to refine enforcement parameters in the ten years following Section 1557's enactment." *Id.*

The court also determined that the second and third standing requirements are satisfied: "HHS's responsibility to enforce Section 1557 supplies a sufficient causal relationship to the asserted injuries, which declaratory and injunctive relief will likely redress." *Id.*

As a result, the court held that the RSM "[p]laintiffs have standing to challenge HHS's interpretation of Section 1557 that requires them to perform and provide insurance coverage for gender-transition procedures" and that the CBA plaintiffs "possess[] associational standing to sue on behalf of [the] members, including the Diocese, Catholic Charities, and the CMA." *Id.* at 1141.

### ii. *Title VII*

The court next held that "the CBA has associational standing to pursue RFRA claims against the EEOC's interpretation of Title VII." *Id.* The associational standing requirements were satisfied for the same reasons given with respect to the Section 1557 claim. *See id.* And, the court concluded that the "three-part injury-in-fact

-18-

standard," *id.* at 1141, including the primarily disputed requirement of "threatened enforcement," *id.* at 1142, was satisfied. The court noted that "[t]he EEOC has never disavowed an intent to enforce Title VII's prohibition on gender-transition exclusions in health plans against the CBA or its members" and "has enforced that very interpretation against other employers." *Id.* at 1142. The standing requirements of causation and redressability were satisfied because "[t]he EEOC shoulders enforcement responsibility for Title VII, and declaratory and injunctive relief will likely redress the threat of enforcement." *Id.*[10]

### b. *Ripeness*

The court held that "[t]he [p]laintiffs' surviving claims against the interpretations of Section 1557 and Title VII" are "ripe for review." *Id.* at 1145. First, the claims "present purely legal questions . . . and need no additional factual development." *Id.* (internal quotation marks omitted). Second, "[p]ractical harm is manifest . . . because the [p]laintiffs must either alter their policies for providing and covering gender-transition procedures . . . or risk the loss of critical federal healthcare funding along with potential civil and criminal penalties." *Id.*

### c. *Mootness*

The court held that "neither case is moot because nothing has changed since the [p]laintiffs submitted their amended complaints." *Id.* at 1146. Specifically, the plaintiffs "remain subject to the interpretations of Section 1557 and Title VII that spurred them to move for relief. . . . , and the challenged legal regime has stayed constant since this litigation recommenced." *Id.*

---

[10]The district court held that the CBA plaintiffs lacked standing to seek relief under Title IX and other federal laws. That claim is not at issue in this appeal.

-19-

The court held that it "w[ould] exercise jurisdiction over the [p]laintiffs' RFRA . . . claim[] challenging the interpretations of Section 1557 and Title VII that compel them to perform and provide insurance coverage for gender transitions." *Id.* at 1146.

## 2. *Summary Judgment*

The district court held that "[a]s applied, the challenged interpretations of Section 1557 and Title VII violate the RFRA" and, as a result, summary judgment was appropriate. *Id.* at 1149. First, the court concluded that "a substantial burden weighs on the exercise of religion" "[b]ecause the interpretations of Section 1557 and Title VII threaten to penalize the Catholic [p]laintiffs for adhering to their beliefs." *Id.* at 1147–48.

Second, the court concluded that "less restrictive alternatives" existed, including the government (1) "assum[ing] the cost of providing gender-transition procedures for those unable to obtain them under their health-insurance policies due to their employers' religious objections"; (2) "providing subsidies, reimbursements, tax credits, or tax deductions to employees"; (3) "paying for services at community health centers, public clinics, and hospitals with income-based support"; (4) "treat[ing] employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage at all"; and (5) "assist[ing] transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and specialize in those services." *Id.* at 1149 (cleaned up).

## 3. *Injunctive Relief*

The district court "permanently enjoin[ed] the [d]efendants from enforcing the successfully challenged interpretations of federal law against the Catholic [p]laintiffs." *Id.* at 1153. It explained, "[W]ith actual success on the RFRA claims

-20-

established, 'the other requirements for obtaining a[n] . . . injunction are generally deemed to have been satisfied.'" *Id.* at 1153 (second and third alterations in original) (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc)).

### 4. *Summary of Holdings*

In summary, the district court (1) declared that HHS's interpretation of Section 1557 requiring the plaintiffs to perform or provide insurance coverage for gender-transition procedures violates the plaintiffs' sincerely held religious beliefs and fails to satisfy strict scrutiny under the RFRA; (2) permanently enjoined HHS and the EEOC "from interpreting or enforcing Section 1557 of the ACA, 42 U.S.C. § 18116(a), or any implementing regulations thereto against the Catholic Plaintiffs in a manner that would require them to perform or provide insurance coverage for gender-transition procedures"; (3) declared that the EEOC's interpretation of Title VII requiring the CBA and the CBA members to provide insurance coverage for gender-transition procedures violates their sincerely held religious beliefs and fails to satisfy strict scrutiny under the RFRA; and (4) permanently enjoined the EEOC "from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the CBA and its members in a manner that would require them to provide insurance coverage for gender-transition procedures." *Id.* at 1153–54.

### E. *Subsequent Developments*
### 1. *HHS*

The day after the district court's order, President Joseph R. Biden, Jr., issued an executive order, citing *Bostock*, which declared that "laws that prohibit sex discrimination . . . prohibit discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021).

-21-

President Biden directed federal agencies to "fully implement statutes that prohibit sex discrimination" consistent with the Administration's interpretation. *Id*.

In April 2021, the Fifth Circuit issued an opinion on the *Franciscan Alliance* plaintiffs' appeal of the district court's denial of permanent injunctive relief. *See Franciscan All., Inc. v. Becerra (Franciscan Alliance III)*, 843 F. App'x 662 (5th Cir. 2021) (unpublished per curiam). The Fifth Circuit "remanded the case to the district court because 'the legal landscape ha[d] shifted significantly' since the district court denied injunctive relief." *Franciscan Alliance V*, 47 F.4th at 373 (alteration in original) (quoting *Franciscan Alliance III*, 843 F. App'x at 662).

In May 2021, HHS issued a notification. *See* Notification of Interpretation and Enforcement of Section 1157 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed. Reg. 27,984-02, 27,984 (May 25, 2021) (hereinafter, "2021 Notification"). The 2021 Notification advised that "[HHS] w[ould] interpret and enforce Section 1557's prohibition on discrimination on the basis of sex" "[c]onsistent with the Supreme Court's decision in *Bostock*." *Id.* at 27,985. As a result, HHS "include[d] . . . [d]iscrimination on the basis of sexual orientation . . . and . . . discrimination on the basis of gender identity" as part of the "prohibition on discrimination." *Id.* "This interpretation w[ould] guide [HHS] in processing complaints and conducting investigations"; however, it was not the determinative factor of "the outcome in any particular case or set of facts." *Id.* The 2021 Notification recognized that "[HHS] w[ould] comply with the [RFRA]." *Id.* "It also encouraged members of the public to file complaints with HHS if they believed the rule had been violated." *Franciscan Alliance V*, 47 F.4th at 373 (citing 2020 Rule, 85 Fed. Reg. at 27,985).

In August 2021, the *Franciscan Alliance* "district court ruled on Franciscan Alliance's motion for a permanent injunction." *Id.* at 373. While HHS argued "that

-22-

the 2020 Rule rendered the case moot," the district court "found that Franciscan Alliance's complaint had challenged Section 1557 in addition to the 2016 Rule, and concluded that Rule 54(c) authorized the court to issue the injunction Franciscan Alliance now sought." *Id.* Additionally, the district court determined "that subsequent events showed that partial vacatur of the 2016 Rule was insufficient to remedy the RFRA violation." *Id.* It concluded that Franciscan Alliance satisfied the requirements for a permanent injunction and "enjoined HHS 'from interpreting or enforcing Section 1557 . . . or any implementing regulations thereto' against Franciscan Alliance 'in a manner that would require [it] to perform' or insure gender-reassignment surgeries." *Id.* (alterations in original) (quoting *Franciscan Alliance IV*, 553 F. Supp. 3d at 378).[11]

In November 2021, HHS noticed its appeal in the *Franciscan Alliance* case. "That same month, it withdrew the appeal in *Walker* and *Whitman Walker*, leaving in place the injunctions reinstating parts of the 2016 Rule." *Franciscan Alliance V*, 47 F.4th at 373.

---

[11]In October 2021, the *Franciscan Alliance* district court modified its August 2021 order to clarify that

> HHS does not violate this order by taking an of the above-described actions against Plaintiffs, their current or future members, or those acting in concern or participation with them, including their respective health plans and any insurers or third-party administrators in connection with such health plans, if the agency officials directly responsible for taking these actions are unaware that an entity is a member of one of the Plaintiffs or has a relevant relationship to one of the Plaintiffs/Plaintiff-members.

*Franciscan All., Inc. v. Becerra*, No. 7:16-CV-00108-O, 2021 WL 6774686, at *1 (N.D. Tex. Oct. 1, 2021).

Appellate Case: 21-1890     Page: 48     Date Filed: 02/09/2023 Entry ID: 5238433

"In March 2022, HHS issued a 'Notice and Guidance on Gender Affirming Care' (the '2022 Notice'). The 2022 Notice states that '[a]ttempts to restrict gender-reassignment surgeries are 'dangerous' and 'covered entities restricting an individual's ability to receive . . . gender-affirming care . . . likely violates Section 1557.'" *Id.* (alterations in original) (quoting HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy, U.S. Dep't of Health & Human Servs. (Mar. 2, 2022), https://perma.cc/LX26-59QR (hereinafter, "2022 Notice")). Moreover, the 2022 Notice advised "that HHS 'is investigating and, where appropriate, enforcing Section 1557' in 'cases involving discrimination on the basis of . . . gender identity.'" *Id.* (alteration in original) (quoting 2022 Notice).

"[O]n August 4, 2022, HHS filed a Notice of Proposed Rulemaking (the 2022 NPRM). This proposed rule, if adopted, would reinstate much the same approach as the 2016 Rule by likewise interpreting Section 1557 to require that hospitals perform gender-reassignment surgeries . . . ." *Id.* (citing Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47824-01, 47871–72, 47878–79 (proposed Aug. 4, 2022)).

Finally, on August 26, 2022, the Fifth Circuit issued its opinion on HHS's appeal of the district court's grant of permanent injunctive relief to the *Franciscan Alliance* plaintiffs. *See Franciscan Alliance V*, 47 F.4th at 368. The Fifth Circuit held that the plaintiffs' APA claim was moot, the RFRA claim was not moot, the district court properly awarded permanent injunctive relief to the plaintiffs, and the plaintiffs had Article III standing to seek a permanent injunction. *See id.* at 371.

## 2. *EEOC*

"Throughout the last four and a half years of fluid regulatory interpretations and litigation surrounding Section 1557, the EEOC's interpretation of Title VII as applied to employers' group health plans has stayed static." *Azar*, 513 F. Supp. 3d at

Appellate Case: 21-1890     Page: 49     Date Filed: 02/09/2023 Entry ID: 5238433

1131 (citing R. Doc. 97, at ¶ 160). Both "before and after *Bostock*," "[t]he EEOC . . . has taken the consistent position that Title VII protects against discrimination based on gender identity." *Id.*

"In line with that stance, the EEOC has pursued enforcement actions against nonhealthcare employers that categorically exclude coverage for gender transitions from their health plans." *Id.* (citing R. Doc. 97, at ¶¶ 156–59).

## II. *Discussion*

On appeal, the government asks this court to vacate the district court's judgment and remand with instructions to dismiss for lack of jurisdiction for three reasons: (1) the plaintiffs lack standing to challenge HHS's and the EEOC's "possible future enforcement" of Section 1557 and Title VII, respectively; (2) the plaintiffs' RFRA claims against HHS and the EEOC are not ripe; and (3) the "plaintiffs have not demonstrated imminent irreparable harm sufficient to justify permanent injunctive relief." Appellants' Br. at 3.

"This court reviews de novo standing and ripeness determinations, and grants of summary judgment." *City of Kennett v. EPA*, 887 F.3d 424, 430 (8th Cir. 2018). A "district court's issuance of a permanent injunction" is reviewed "for abuse of discretion." *Kennedy Bldg. Assocs. v. CBS Corp.*, 576 F.3d 872, 876 (8th Cir. 2009).

### A. *Standing*

"Article III standing must be decided first by the court and presents a question of justiciability; if it is lacking, a federal court has no subject-matter jurisdiction over the claim." *Schumacher v. SC Data Ctr., Inc.*, 912 F.3d 1104, 1105 (8th Cir. 2019) (internal quotation marks omitted). Standing must exist "throughout the case because to qualify as a case fit for federal-court adjudication, an actual controversy must be

Appellate Case: 21-1890    Page: 50    Date Filed: 02/09/2023 Entry ID: 5238433

extant at all stages of review, not merely at the time the complaint is filed." *Id.* (cleaned up).

"The party invoking federal jurisdiction bears the burden of establishing standing." *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted).

### 1. *Associational Standing*

As an initial matter, the government argues that "the district court erred in concluding that CBA has associational standing to sue on behalf of its unnamed members." Appellants' Br. at 29.

The district court determined that CBA had associational standing to sue on behalf of its unnamed members who receive federal funding. *See Azar*, 513 F. Supp. 3d at 1137 ("Members on whose behalf suit is brought may remain unnamed."); *id.* ("As for the ability of individual members to sue, the CBA's verified second amended complaint confirms that its membership includes Catholic hospitals and other healthcare entities 'that receive Medicaid and Medicare payments and participate in HHS-funded programs.' That places at least some CBA members on equal footing with the Religious Sisters of Mercy Plaintiffs." (quoting R. Doc. No. 97, ¶¶ 55–56)).

The government argues that "the district court's conclusion that 'members on whose behalf suit is brought may remain unnamed' is contrary to the Supreme Court's requirement that an organization must identify particular members and their injuries in order to establish associational standing." Appellants' Br. at 29–30 (first quoting *Azar*, 513 F. Supp. 3d at 1137, then citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009); *Ouachita v. Watch League v. U.S. Forest Serv.*, 858 F.3d 539, 543 (8th Cir. 2017)).

We agree. In *Summers*, the Court rejected the following "organizational standing [test]: whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury." 555 U.S. at 497. According to the Court, such a "novel approach to the law of organizational standing would make a mockery of [the Court's] prior cases, *which have required plaintiff organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm.*" *Id.* at 498 (emphasis added) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1983) (holding that organization lacked standing because it did not "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected" by the allegedly illegal activity); *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) ("Nowhere in the pleadings or affidavits did the [organization] state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents."); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990) (noting city's affidavit to establish standing was insufficient because it failed to name the individuals who were harmed by the challenged program)).

A court cannot "accept[] the organizations' self-descriptions of their membership" because "the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Id.* at 499. "While it is certainly possible—perhaps even likely—that one individual will meet all th[e] criteria, that speculation does not suffice." *Id.* The Court explained that "[s]tanding . . . requires . . . a factual showing of perceptible harm." *Id.* (third alteration in original) (quoting *Lujan*, 504 U.S. at 566). Thus, the Court "require[s] plaintiffs

-27-

Appellate Case: 21-1890     Page: 52     Date Filed: 02/09/2023 Entry ID: 5238233

claiming an organizational standing to identify members who have suffered the requisite harm." *Id.*[12]

Other than the three named plaintiffs who are CBA members—the Diocese, Catholic Charities, and CMA—the CBA has otherwise failed to identify members who have suffered the requisite harm. *See id.* Accordingly, we hold that the CBA lacks associational standing to sue on behalf of unnamed members.

### 2. *Standing: Section 1557*

We now turn to whether the Religious Sisters plaintiffs and the remaining CBA plaintiffs have standing to challenge HHS's enforcement of Section 1557. The government argues that the district court erroneously concluded that the plaintiffs have "standing with respect to their claims against HHS's enforcement of Section 1557." Appellants' Br. at 25. We disagree.

"To establish Article III standing, a party invoking federal jurisdiction must show (1) that the plaintiff suffered an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision will likely redress the injury." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022).

---

[12]The Court's "requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Id.* at 498–99 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958) (all organization members affected by release of membership lists)). In the present case, the CBA has not argued that all of its members are affected.

Appellate Case: 21-1890     Page: 28     Date Filed: 02/09/2023 Entry ID: 5238433

Here, the government "doesn't dispute causation or redressability; thus, 'the only real question is whether [the plaintiffs] have suffered an injury in fact.'" RSM plaintiffs' Br. at 30 (quoting *Telescope Media v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019)). An individual need not be "subject to . . . a threat, an actual arrest, prosecution, or other enforcement action . . . to challeng[e] the law." *Susan B. Anthony List*, 573 U.S. at 158. Pre-enforcement review is permissible "under circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159. "Specifically, [the Supreme Court has] held that a plaintiff satisfies the injury-in-fact requirement where he alleges '[(1)] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [(2)] [arguably] proscribed by a statute, and there [(3)] exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The government has not contested the district court's conclusion that "the [p]laintiffs' conduct implicates constitutional interests" because their "refusal to perform or cover gender-transition procedures is predicated on an exercise of their religious beliefs protected by the First Amendment." *Azar*, 513 F. Supp. 3d at 1138. Instead, it argues that the district court erred in concluding that (1) "Section 1557 arguably proscribes the [p]laintiffs' refusal to perform or cover gender-transition procedures," and (2) a credible threat of enforcement exists because the plaintiffs' "course of action is within the plain text of [the] statute." Appellants' Br. at 25, 27 (internal quotation marks omitted).

In determining whether the plaintiffs' conduct is arguably proscribed and whether they face a credible threat of enforcement, we find instructive the Fifth Circuit's recent decision in *Franciscan Alliance*. There, "HHS argue[d] that Franciscan Alliance's RFRA claims . . . bec[a]me moot because the 2016 Rule was replaced by the 2020 Rule." *Franciscan Alliance V*, 47 F.4th at 376. The court concluded that HHS failed to carry its burden "to demonstrate that it is absolutely

-29-

clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (internal quotation marks omitted). First, the court described how "the district court injunctions, the 2020 Rule, and the 2021 [Notification]" proscribe Franciscan Alliance's refusal to perform or cover gender-transition procedures. *Id.* According to the court, those sources "combined to threaten Franciscan Alliance in the same way that the challenged portions of the 2016 Rule did." *Id.*

Second, the court demonstrated how Franciscan Alliance faces a threat of prosecution. *See id.* According to the court, "HHS [recently] issued the 2022 Notice, which warned covered entities like Franciscan Alliance that refusing to offer gender-reassignment surgeries violates Section 1557." *Id.* Furthermore, the court noted, "HHS has . . . repeatedly refused to disavow enforcement against Franciscan Alliance. In its brief on appeal, HHS simply says it 'has not to date evaluated' whether it will enforce Section 1557 against Franciscan Alliance—in other words, it concedes that it may." *Id.* The court rejected HHS's argument "that the district court violated Article III when it granted Franciscan Alliance a permanent injunction against hypothetical future Section 1557 enforcement." *Id.* at 379. The court acknowledged that "the [g]overnment's interest may subtly evolve over time." *Id.* But it noted that "[i]f that hypothetical chance is enough to defeat standing, then plaintiffs could never obtain injunctive relief to prevent future violations of the Free Speech Clause, the Equal Protection Clause, or any other lawsuit where means/ends scrutiny is involved." *Id.* To the contrary, the court pointed out, "[c]ourts have issued permanent injunctions in these contexts countless times." *Id.* (citing *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 789 (2011) (affirming permanent injunction in a free speech case); *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014) (same); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210 (1995) (plaintiff had standing to seek injunctive relief to prevent future violations of the Equal Protection Clause); *F. Buddie Contracting Co. v. City of Elyria*, 773 F. Supp. 1018, 1033 (N.D. Ohio 1991) (permanently enjoining enforcement of local

-30-

ordinance for violating the Equal Protection Clause)). HHS was unable to "cite a single case where a court refused to grant a permanent injunction because of the hypothetical chance that the Government could advance a compelling government interest sometime in the future." *Id.* at 380. The court declined "to be the first [one] to do so." *Id.*

Although the question in *Franciscan Alliance* was one of mootness, the court invoked its standing jurisprudence to buttress its conclusion. *See id.* at 376 ("We have repeatedly held that plaintiffs have standing in the face of similar prosecutorial indecision."). "Indeed," the court observed, "the burden of proving mootness is higher than simply showing a lack of standing." *Id.* at 377 n.40 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (noting that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness")). "Suffice it to say that if there is an ongoing dispute giving a plaintiff standing, the case is not moot," the court explained. *Id.* (citing *Friends of the Earth*, 528 U.S. at 189–92).[13] The court reviewed its prior standing determination in *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338 (5th Cir. 2020). *Id.* at 377. In that case, "the defendant vaguely promised to not enforce the

---

[13]We, too, have recognized that standing is "[a] close cousin of mootness." *Noem v. Haaland*, 41 F.4th 1013, 1017 (8th Cir. 2022). "[T]he difference between standing and mootness is merely one of 'time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). "The doctrines of standing and mootness, properly applied, ensure that federal courts will decide only concrete disputes and will refrain from publishing advisory opinions or judicial essays on issues of the day." *Hawse v. Page*, 7 F.4th 685, 695 (8th Cir. 2021).

-31-

challenged policies 'contrary to the First Amendment'—similar to HHS's promise to 'comply with the Religious Freedom Restoration Act . . . and all other legal requirements.'" *Id.* (alteration in original) (first quoting *Speech First, Inc.*, 979 F.3d at 338, then quoting 2021 Notification, 86 Fed. Reg. at 27,985). The court held that standing existed because the plaintiffs "were within the 'class whose [conduct] is arguably restricted,' and the defendant's promise was so vague that the scope of liability was both 'unknown by the [defendant] and unknowable to those regulated by it.'" *Id.* (alterations in original) (quoting *Speech First, Inc.*, 979 F.3d at 338); *see also id.* (quoting *Pool v. City of Houston*, 978 F.3d 307, 310 (5th Cir. 2020) (holding that plaintiffs had standing to bring an "immediate[]" challenge to a city charter provision where "[t]he City . . . indicated that it had not yet determined its position on the Charter requirements' enforceability")). Similarly, "HHS has steadfastly refused to promise that it would not enforce Section 1557 or the 2016 Rule." *Id.*

The court also rejected HHS's reliance on *Iowa Right to Life Committee, Inc. v. Tooker*, 717 F.3d 576 (8th Cir. 2013)—a case upon which the government also relies in the present case. *See id.*; *see also* Appellants' Br. at 24. In *Tooker*, "there was no credible threat of enforcement" because "[t]he Eighth Circuit certified the case to the Iowa Supreme Court, and its opinion was 'clear' that the plaintiffs were not covered by the statute." *Franciscan Alliance V*, 47 F.4th at 377 (citing *Tooker*, 717 F.3d at 585–86). By contrast, the court concluded that a "substantial reason [exists] to believe that Franciscan Alliance falls within the scope of Section 1557, especially post-*Bostock*." *Id.*

The foregoing analysis supports our conclusion that the plaintiffs have suffered an injury-in-fact from the government's interpretation of Section 1557. *See Susan B. Anthony List*, 573 U.S. at 158. While the government argues that the plaintiffs lack standing because the 2020 Rule "rescinded" the 2016 Rule, *see* Appellants' Br. at 23, the Fifth Circuit expressly rejected this argument in *Franciscan Alliance*, *see* 47 F.4th

-32-

at 376. We agree with the Fifth Circuit that "the district court injunctions, the 2020 Rule, and the 2021 [Notification] combined to threaten [the plaintiffs] in the same way that the challenged portions of the 2016 Rule did." *Id.* Collectively, these sources demonstrate that the plaintiffs' conduct—their refusal to perform or cover gender-transition procedures—is "arguably proscribed" by Section 1557. *Cf. FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) ("Here, however, appellees seek to challenge the one Government action that causes their harm: the FEC's threatened enforcement of the loan-repayment limitation, *through its implementing regulation*. In doing so, they may raise constitutional claims against Section 304, *the statutory provision that, through the agency's regulation, is being enforced*." (emphases added and omitted)).

We also reject the government's argument that the plaintiffs lack injury because it "has not to date taken a position on whether plaintiffs' conduct violates the relevant statutes and has not threatened any enforcement action against plaintiffs." Appellants' Br. at 2; *see also id.* at 16 ("The central flaw in the district court's decision is . . . [that] [t]he court enjoined the government from enforcing the statutes in a way that the government has not to date indicated that it will enforce them."); *id.* at 24 ("Because the government has not to date concluded that plaintiffs' conduct violates the relevant statute, this Court should reject plaintiffs' attempts to pretermit the agency's evaluation of the issues and obtain a preemptive judicial declaration that HHS may not bring an enforcement action against plaintiffs."). As the Fifth Circuit explained, the government's assertion that "it 'has not to date evaluated' whether it will enforce Section 1557 against [the plaintiffs]" is actually a "conce[ssion] that it may" do so. *Franciscan Alliance V*, 47 F.4th at 376. Just as in *Franciscan Alliance* where the HHS "repeatedly refused to disavow enforcement against Franciscan Alliance," *id.*, so, too, has it refused in the present case. In fact, HHS has promised (1) "robust enforcement of Section 1557" in the 2016 Rule, 81 Fed. Reg. at 31,440; and (2) to "vigorously enforce [Section 1557's] prohibitions on discrimination based on . . . sex" in the 2020 Rule, 85 Fed. Reg. at 37,175.

-33-

Furthermore, HHS expressly "decline[d] to adopt commenters' suggestion that [it] import Title IX's blanket religious exemption into Section 1557," noting that "Section 1557 itself contains no religious exemption" and that "Title IX and its exemption are limited in scope to educational institutions." 2016 Rule, 81 Fed. Reg. at 31,380 (footnote omitted). Although the 2020 Rule did include a religious exemption, HHS is enjoined from enforcing it. *See Whitman Walker*, 485 F. Supp. 3d at 64; *cf. Sch. of the Ozarks*, 41 F.4th at 1000 ("The [Department of Housing and Urban Development's] Memorandum does not make the College's housing policies unlawful without regard to legal protections for religious liberty [under Title IX]."). Although the government maintains that it "will comply" with RFRA, Appellants' Br. at 24, its promise is "so vague that the scope of liability [is] both 'unknown by the [government] and unknowable to [the plaintiffs],'" who are "within the 'class whose [conduct] is arguably restricted.'" *Franciscan Alliance V*, 47 F.4th at 377 (fourth alteration in original) (quoting *Speech First, Inc.*, 979 F.3d at 338). The government's claim that the district court violates Article III by enjoining "hypothetical future action," Appellants' Br. at 3, "proves too much." *Franciscan Alliance V*, 47 F.4th at 379.

Finally, the government cannot identify a long history of nonenforcement against the plaintiffs and others like them. *Cf. Sch. of the Ozarks*, 41 F.4th at 1000, 1001 (noting that "HUD has never enforced the Fair Housing Act's sex-discrimination prohibition against a college whose housing policies have been exempted from the prohibition on sex discrimination under Title IX" and "never enforced the Fair Housing Act's sex-discrimination prohibition against the College, even though the agency interpreted the Fair Housing Act to prohibit discrimination on the basis of sexual orientation and gender identity between 2012 and 2020"). To the contrary, the plaintiffs have cited enforcement activity in the years prior to the filing of the operative complaint suggesting that the rule is likely to be enforced against them. *See* RSM plaintiffs' Br. at 37–41; CBA plaintiffs' Br. at 29–32.

Appellate Case: 21-1890     Page: 59     Date Filed: 02/09/2023 Entry ID: 5238233

For these reasons, we hold that the plaintiffs have satisfied the elements necessary to establish standing to challenge the government's interpretation of Section 1557.

### 3. *Standing: Title VII*

"Title VII of the Civil Rights Act of 1964 bans all employers with 15 or more employees—whether receiving federal funding or not—from engaging in sex discrimination." *Azar*, 513 F. Supp. 3d at 1125–26 (citing 42 U.S.C. § 2000e-2(a), 2000e(b)). The government argues that "[t]he CBA plaintiffs have not demonstrated any Article III case or controversy with respect to their challenge to EEOC's interpretation of Title VII and possible future enforcement efforts against plaintiffs." Appellants' Br. at 35. We disagree.

As the district court explained, "Akin to the Section 1557 claims, the three-part injury-in-fact standard . . . continues to control. Applying that standard, the [CBA] [p]laintiffs' refusal to cover gender-transition procedures in their health plans stems from a First Amendment exercise of their religious beliefs." *Azar*, 513 F. Supp. 3d at 1141 (citing *United States v. Ali*, 682 F.3d 705, 709 (8th Cir. 2012) (explaining that the RFRA safeguards First Amendment free-exercise rights)). Further, Title VII "quite clearly" proscribes the CBA plaintiffs' conduct under the EEOC's interpretation. *Id.* In *Macy*, the EEOC concluded that "[w]hen an employer discriminates against someone because the person is transgender, the employer has engaged in disparate treatment 'related to the sex of the victim,'" in violation of Title VII. 2012 WL 1435995, at *7 (quoting *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000)); *cf. EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986) ("[R]eligious employers are not immune from liability under Title VII for discrimination based on sex." (cleaned up)); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) ("Title VII . . . applies . . . to a religious institution charged with sex discrimination."); *Rayburn v. Gen. Conf. of Seventh Day Adventists*,

-35-

772 F.2d 1164, 1166 (4th Cir. 1985) ("Title VII does not confer upon religious organizations a license to make . . . decisions on the basis of race, sex, or national origin.").

The government's primary argument is that the CBA plaintiffs have failed to show that "a credible threat of prosecution" exists. *See Susan B. Anthony List*, 573 U.S. at 159 (internal quotation marks omitted). Specifically, it contends that the CBA plaintiffs have (1) never "been asked to cover gender-transition services for any particular employee"; (2) failed to show "that [the] EEOC would likely find reasonable cause to believe that unlawful discrimination occurred and then exercise its discretion to bring an enforcement action against Diocese or Catholic Charities after a failed attempt at voluntary conciliation"; and (3) failed to show "that [the] EEOC has ever brought an enforcement action in district court against *any* employer to challenge the employer's exclusion of transition procedures in its health plan, let alone a *religious* employer that has raised religious objections to such procedures." Appellants' Br. at 37, 39. According to the government, the "EEOC has not taken a position on how, if at all, Title VII should be enforced against religious employers that object to providing insurance coverage for gender-transition services"; the question, it contends, remains "open." *Id.* at 39 (citing EEOC Compliance Manual on Religious Discrimination, Directive 915.063, § 12 (Jan. 15, 2001), *available at* https://go.usa.gov/x6bp4 (stating that the "applicability and scope of . . . defenses based on Title VII's interaction with the First Amendment or . . . RFRA[] is an evolving area of the law," advising EEOC investigators to "take great care" in situations involving the RFRA, directing EEOC personnel to "seek the advice of the EEOC Legal Counsel in such a situation," and noting that "on occasion, the [EEOC] Legal Counsel may consult as needed with the U.S. Department of Justice")).

Contrary to the government's position, we conclude that the district court correctly determined that the CBA plaintiffs face a "credible threat" of enforcement

-36-

from the EEOC. As explained *supra*, the plaintiffs face a credible threat of enforcement from HHS under Section 1557; in turn, HHS has previously explained its coordinated effort with the EEOC to "pursue Title VII enforcement actions against nonhealthcare employers with gender-transition exclusions in their group health plans." *Azar*, 513 F. Supp. 3d at 1126 (citing R. Doc. 97, at ¶ 165). "Where . . . [HHS] lacks jurisdiction over an employer responsible for benefit design, [HHS] . . . will refer or transfer the matter to the EEOC and allow that agency to address the matter." 2016 Rule, 81 Fed. Reg. at 31,432. The date of filing with HHS is "deemed the date it was filed with the EEOC." *Id.* Additionally, "the EEOC has pursued enforcement actions against nonhealthcare employers that categorically exclude coverage for gender transitions from their health plans." *Azar*, 513 F. Supp. 3d at 1131 (citing R. Doc. 97, at ¶¶ 156–59). Its pursuit of these enforcement actions, coupled with its failure to "disavow[] any intent to enforce Title VII's prohibition on gender-transition exclusions in health plans against the [religious employers]," lends further support to the district court's conclusion that the CBA plaintiffs face a credible threat of enforcement by the EEOC. *Id.* at 1142.

## B. *Ripeness*

Having concluded that the plaintiffs have standing to bring their claims, we next address the government's argument that the plaintiffs have failed to demonstrate ripeness for their challenge to HHS's future enforcement of Section 1557 and the EEOC's future enforcement of Title VII.

Ripeness is a "closely related doctrine" of standing that "originates from the same Article III limitation." *Sch. of the Ozarks*, 41 F.4th at 997 (citing *Susan B. Anthony List*, 573 U.S. at 157 n.5). The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its

-37-

Appellate Case: 21-1890   Page: 62   Date Filed: 02/09/2023   Entry ID: 5238433

effects felt in a concrete way by the challenging parties." *Id.* at 997–98 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). "[T]he complainant must show both 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration'" "[t]o demonstrate that an alleged dispute is ripe for review." *Id.* at 998 (quoting *Abbott Lab'ys*, 387 U.S. at 149). A case that "would not benefit from further factual development and poses a purely legal question not contingent on future possibilities . . . is fit for judicial decision." *Id.* "In this case, standing and ripeness essentially 'boil down to the same question' . . . ." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 157 n.5). Therefore, it is appropriate for us to "address the issue [of ripeness] in terms of 'standing.'" *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 157 n.5).

Because we have already held that the plaintiffs have standing to challenge HHS's interpretation of Section 1557 and the EEOC's interpretation of Title VII, we necessarily hold that their claims are ripe for judicial review. *See id.*; *see also Franciscan Alliance IV*, 553 F. Supp. 3d at 374 ("[T]he [c]ourt concludes that the current regulatory scheme for Section 1557 'clearly prohibits' Plaintiffs' conduct, thus, putting them to the 'impossible choice' of either 'defying federal law' and risking 'serious financial civil penalties,' or else violating their religious beliefs." (citation omitted)).

## C. *Irreparable Harm*

Finally, the government argues that the district court erred in granting the plaintiffs permanent injunctive relief because they failed to "demonstrate[] imminent irreparable harm sufficient to justify permanent injunctive relief against HHS and EEOC." Appellants' Br. at 50.[14]

---

[14]"A permanent injunction requires the moving party to show actual success on the merits." *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020) (quoting *Oglala*

-38-

Appellate Case: 21-1890    Page: 68    Date Filed: 02/09/2023    Entry ID: 5238433

In *Franciscan Alliance V*, the Fifth Circuit rejected the argument that "the district court erred in granting the permanent injunction because Franciscan Alliance did not satisfy the irreparable harm standard." 47 F.4th at 380. It held "that the loss of freedoms guaranteed by . . . RFRA . . . constitute[s] per se irreparable harm." *Id.* (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 294 (5th Cir. 2012)).

Other circuits are in agreement that "establishing a likely RFRA violation satisfies the irreparable harm factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[A] plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA."); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1187 (10th Cir. 2003) (same)); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." (citing *Alameen v. Coughlin*, 892 F. Supp. 440, 447–48 (E.D.N.Y. 1995) ("[A] finding under RFRA that a regulation creates a substantial burden on an individual's exercise of his or her religion constitutes a finding of irreparable harm."); *Luckette v. Lewis*, 883 F. Supp. 471 (D. Ariz. 1995) (holding loss of prisoner's ability to practice central tenets of his religion for extended amount of time was irreparable injury warranting preliminary injunction under RFRA)).

---

*Sioux Tribe v. C & W Enters. Inc.*, 542 F.3d 224, 229 (8th Cir. 2008)). Once the moving party shows actual success on the merits, a court "must then consider three factors to determine whether a permanent injunction is warranted: '(1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest.'" *Id.* (quoting *Oglala Sioux Tribe*, 542 F.3d at 229). Here, the government has challenged only the district court's conclusion that the plaintiffs failed to show the threat of irreparable harm.

-39-

Appellate Case: 21-1890    Page: 64    Date Filed: 02/09/2023 Entry ID: 5238433

We agree with these courts and therefore conclude that the district court correctly held that "intrusion upon the Catholic Plaintiffs' exercise of religion is sufficient to show irreparable harm." *Azar*, 513 F. Supp. 3d at 1153 (citing *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012) ("CEF can demonstrate that it has a high likelihood of success on the merits of its First Amendment claim, which is likely enough, standing alone, to establish irreparable harm.")).

## III. *Conclusion*

Accordingly, we affirm the district court's grant of permanent injunctive relief to the plaintiffs except to the extent it recognizes the associational standing of the CBA. We remand for further proceedings consistent with this opinion.

_____

-40-

Appellate Case: 21-1890    Page: 65    Date Filed: 02/09/2023 Entry ID: 5238433